## Wolders Estate

*Harold J. Conner*, for accountant.

*A. Harry Levitan*, for claimants.

*Judith J. Jamison*, Special Assistant Attorney General, and *Ralph C. Donohoe*, for Commonwealth.

*Abraham A. Levinthal*, for City of Philadelphia.

BOLGER, J., June 26, 1962.—Decedent died January 18, 1956, intestate, unmarried and without issue. . .

In the report of the administratrix attached to the statement of proposed distribution and filed in accordance with rules 69.4 and 69.5, it was stated that the nearest of kin were all residents of Czechoslovakia. They are stated to have been Rudolph Scherfel, a brother; Jozef Marusinsky, a nephew; Wilma Scherfel, a niece; Frantisek Marusinsky, a nephew, and Anna Marusinsky and four minor children, viz., Juraj,

Ladislav, Jozef and Daniela Marusinsky, the surviving spouse and children of Jan Marusinsky, who survived decedent, but subsequently died June 27, 1956.

All of the above named reside in Czechoslovakia.

A. Harry Levitan, Esq., appeared for all parties in interest excepting Jozef Marusinsky, who is entitled to receive one-fourth of the estate. He was not represented at any of the hearings.

This estate was originally called for audit December 1, 1958. There have been several hearings, the most recent having been held on May 22, 1962.

The Commonwealth of Pennsylvania has properly raised two issues, viz., the identity of the claimants and whether as distributees they would have the full use and enjoyment of their share of the estate if it were sent to them in Czechoslovakia.

As usual there were presented powers of attorney which were executed in Czechoslovakia and acknowledged by the United States Consular Office who certified that the persons who signed them were personally known to him and that the execution was made freely and voluntarily. These powers of attorney were later compared by a handwriting expert with other letters and communications received from the persons who signed the powers and there was substantial testimony following which it was agreed by counsel representing the accountant and counsel representing the Commonwealth of Pennsylvania that a family tree had been properly established and that all of the claimants excepting Jozef Marusinsky were actually the heirs of Ella Wolders under the Intestate Act of Pennsylvania.

It is acknowledged by all parties that the United States Treasury Department is not remitting funds to residents of Czechoslovakia who may be entitled to payments from the United States Government. The auditing judge could shorten this adjudication by

taking judicial notice of the action of the Treasury Department. The reason for withholding distribution of Federal funds is that the United States Government, through its Department of State having first hand information, does not believe that the payees would have the full beneficial use and enjoyment if the money were to be sent to them.

In this case, the court was given the benefit of expert testimony. On behalf of the claimants, Dr. Alexander Gustav Bozdech, a practicing attorney since 1933, and presently a member of the Legal Advice Bureau in Prague, testified. He cited extensively from Edicts published by the Minister of Justice in Czechoslovakia and from the Collection of Laws. He stated that the right to receive property by inheritance is protected and that the intestate law closely follows that of Pennsylvania. The administration of the estate and collection of inheritance tax is within the jurisdiction of notaries.

Dr. Bozdech then stated that if inheritances were received in Czechoslovakia from abroad and had been taxed in the domicile of decedent, there would be no further tax upon the recipient of the distribution. He then explained that funds received from abroad and deposited in a State Bank, which is the only bank in Czechoslovakia and is fully controlled by the government, the distributee will be entitled to receive 7.2 crowns for each dollar. If, however, the distributee prefers to purchase consumable goods from Tuzex, a retail outlet wholly owned and controlled by the government, he then will receive 40 percent of the inheritance at an exchange rate of 14.4 crowns to the dollar, which he must spend in the purchase of durable goods. In certain instances, as for example where the goods purchased are for the establishment of a home or a permanent improvement, he can receive 60 percent at the rate of 14.4 for each dollar.

The witness stated that private ownership of real estate is not prohibited and stated that he and his mother had received a property by inheritance and that they resided in a part of the home and rented two other parts. It was his opinion as a practicing attorney that parasitism under the law of his country involved two things, a failure to work and obtaining money by, as he stated, "shady" methods. He stated that the acquisition of consumer goods in large amounts for the purpose of resale was "speculation" and punishable by confiscation of the goods and "deprivation of liberty." He acknowledged that packages sent to Czechoslovakia through any agency other than the Tuzex, which operates extensively in this country through agents, would be very heavily taxed.

This witness freely acknowledged that he had been sent here by his government to testify in not only the present case, but in several other cases throughout the country which were then pending in an effort to convince this court and other courts that legacies and inheritances sent from this country to residents of Czechoslovakia would be received by the proper persons without interference or confiscation by the government.

His entire testimony must be regarded as being biased and prejudiced. He certainly was not a disinterested witness although he is not a party in interest. It is interesting to note that the apparent attractiveness of exchanging 40 or 60 percent of American dollars into Czechoslovakian crowns at the rate of 14.4 instead of 7.2 crowns is a fixed and arbitrary rate established by the government. At the same time, it is acknowledged that the rate of exchange between the two currencies in the world of trade is 33 crowns for each dollar. That which appears to be benevolent treatment is still giving the resident much less than 50 percent

of the real value of the inheritance. The balance goes directly to the government.

As their second witness, claimants called Jerome Alper, a member of the bar of New Jersey since September 1922. He testified that New Jersey has a law similar to our Act of July 28, 1953, P. L. 674. He cited the case of Vladimir Pesula et al. v. First National Iron Bank of Morrisville, in which case he represented two residents of Czechoslovakia and in their behalf obtained a final order from the Superior Court, Chancery Division, Morris County, directing distribution of a substantial estate to Czechoslovakia. This litigation ended in 1957, and $3,500 each were sent to three persons with the directions that before disbursement would be made, a receipt executed in the presence of the American Counsul would be required. The witness introduced several photostatic copies of receipts for not only these remittances, but an additional $5,000. He then stated that he personally visited the distributees in Czechoslovakia, conversed with them in Prague and they acknowledged that the funds had been received; that Tuzex bonds had been exchanged at the so-called favorable rate and in one instance 60 percent of the inheritance was exchanged at 14.4 because the recipient was making a permanent improvement to his home. Mr. Alper related several other cases where he has been instrumental in procuring funds for Czechoslovakian residents from the estates of New Jersey decedents.

He acknowledged that there is a "terrific amount" of money on deposit with various surrogates in New Jersey, which money belongs to heirs and legatees in Czechoslovakia. When asked whether the money was so deposited because the surrogate could not find that the various legatees would get the benefit, use, enjoyment and control of the property, the witness stated, ". . . I don't know", and then proceeded to refer to

one case involving Hungarian heirs. He admitted that he is frequently retained by the Czech Embassy and acknowledged that his fee is between 30 percent and 35 percent.

Another witness, Anthony Corea, an officer in a foreign remittance business, testified that his company had transmitted more than one and one-half million dollars to Czechoslovakia during a fiscal year ending in May 1959. His company employs 85 sales representatives who solicit relatives in this country to send gift certificates or packages containing food or consumers' goods. If money is sent, the dollars are exchanged for Tuzex certificates at the rate of 14.4 for each dollar. No goods are purchased in America and shipped from America. If an alleged package is purchased, the commodities come out of Tuzex's warehouses in Czechoslovakia and yet the witness endeavored to demonstrate that the Czechoslovakian resident was given preferential treatment by comparing the cost of the commodities purchased in an American retail store plus the cost of packaging and shipping. It is obvious that this comparison is fatuous when you consider the fact that Tuzex is a governmental monopoly and the further fact that even at 14.4 crowns to the dollar, the government is receiving through its State Bank a dollar which is worth 33 crowns in world trade.

The witness acknowledged that the sales agents received 15 percent for soliciting the business and further acknowledged that there are no samples which can be shown in this country, but all of the commodities are displayed in catalogs which are frequently revised.

The Commonwealth called as its expert Dr. Alos Rozehnal, who obtained his degree as Doctor of Laws at Charles University, Prague, in 1932. He practiced law until 1948, taught constitutional law at Brno Uni-

versity, and he left Czechoslovakia in February of 1948, immediately after the Communist coup d'etat. Since then he has resided in Germany and France and has lived in this country since 1951. He is employed by a private corporation and his work consists of analysis, research and evaluation of Czechoslovakian economic and political press and the collection of laws. He receives all of the daily newspapers, provisions of the constitution and the official gazette published by the Ministry of the Interior in Prague. He has written several articles published both in this country and abroad and was present during the examination of claimant's expert. His testimony was in sharp contrast to that of Dr. Bozdech. He documented his opinions by reference to many official publications of the Czechoslovakian government. His conclusion that residents of Czechoslovakia would not have the full use, benefit and control of inheritances sent to them was based on the fact that private ownership is not protected by law excepting such property which is for personal use, such as food, clothing and furniture, and the possession of these is restricted; if money is deposited in the State Bank as a savings account, it is subject to confiscation. If one purchases more goods than is reasonably required (and the government determines the reasonableness), he is liable to be prosecuted criminally. If he invests the money in land for the purpose of farming, he has made a useless investment because of the quota system which imposes on all private farmers, that is to say those who are not members of a collective farm, a burden which it is almost impossible to carry. If the money is used to build a home, the house must be restricted in area to conform to the limitations established by law for all living quarters. If the house exceeds this limitation, then the excessive space must be rented as living quarters at rates established by law. He gave examples of prosecution for parasitism. One

involved a lawyer who gave advice to a client although he was not a member of the legal advice bureau. Another involved the ownership of a lathe and the use of it by a mechanic. In both instances, jail sentences were imposed.

It is unnecessary to treat in further detail the testimony of Dr. Rozehnal.

This case as presented followed the pattern established in Zupko Estate, 15 D. & C. 2d 442 (1958), which involved distributees in the U. S. S. R. All that was said in that case concerning organic laws and the policies of the Soviet Government, its constitution and objectives, applies with equal force in the present case. Czechoslovakia is following the policy of the Communist party as enunciated in the Kremlin. It is a totalitarian country where the state is supreme and the citizen its vassal.

Section 2 of the Act of 1953, supra, provides as follows:

"Whenever it shall appear to the court that if distribution were made a beneficiary would not have the actual benefit, use, enjoyment, or control of the money or other property distributed to him by a fiduciary, the court shall have the power and authority to direct the fiduciary (a) to make payment of the share of such beneficiary at such times and in such manner and amounts as the court may deem proper, or (b) to withhold distribution of the share of such beneficiary, convert it to cash, and pay it through the Department of Revenue into the State Treasury without escheat."

I find that the known and identified distributees, Jozef Marusinsky, entitled to one-fourth, Wilma Serfel, entitled to another one-fourth, Frantisek Marusinsky, entitled to one-eighth, and Juraj, Ladislav, Josef and Daniela Marusinsky, each entitled to one-thirty-second, could not have the actual benefit, use, enjoy-

ment or control if their distributive shares were sent to them in Czechoslovakia.

The family tree was established with the aid of testimony of a person who had intimately known the decedent, correspondence, birth, death and marriage certificates (which, although not duly authenticated have buttressed the other testimony), and the testimony of a handwriting expert. The Commonwealth, whose duty it is to require and test proof of pedigree, was satisfied that the above named persons are the persons entitled as heirs to three-fourths of the estate.

With reference to Rudolph Scherfel, a letter written by him and a photograph bearing his alleged signature were used as standards for the purpose of comparing the signature which appears on the power of attorney designating A. Harry Levitan his attorney-in-fact. It was the opinion of the handwriting expert, Mr. Leon W. Melcher, that the signature on the power of attorney was not in the handwriting of the person who wrote the letter and who signed the photograph.

The Commonwealth agrees that a person named Rudolph Scherfel is or was the brother of decedent, but claimed that his identity as the person who signed the letter of attorney had not been established. The court agrees with this contention and the share of Rudolph Scherfel will be awarded to be paid into the State Treasury of the Commonwealth pursuant to section 1314 of the Fiscal Code of April 9, 1929, P. L. 343.

At the conclusion of the audit, counsel for the accountant requested additional compensation in the sum of $750. In view of the effort that has been expended, this request is allowed.

Counsel representing claimants requested compensation in the sum of $2,250. A statement of the services he rendered was set forth in a communication dated May 29, 1962, a copy of which is annexed. Ordinarily, such a request would be denied. However,

in this instance it is acknowledged that Mr. Levitan has expended a great deal of time and effort on behalf of his clients and in bringing expert testimony and other witnesses to the court to assist the court in reaching a conclusion. The request for counsel fee is allowed in the sum of $2,000, provided Mr. Levitan agrees to accept it as complete compensation so that if at a later date it is possible for Rudolph Scherfel to establish his identity and it is further possible for distribution to be made to all of the distributees or their successors, Mr. Levitan is not to receive any additional compensation.

Counsel has submitted an addendum to the account as stated. Copies have been given to counsel for claimants and for the Commonwealth. Reference to it shows that the various claims set forth in the statement of proposed distribution have been paid. It also shows the payment of administration expenses and finally the income which has accrued since the last accounting. . .

And now, June 26, 1962, the account is confirmed nisi.